1

2

3

4

5

6

7                         UNITED STATES DISTRICT COURT

8                       NORTHERN DISTRICT OF CALIFORNIA

9  JONATHAN B. BUCKHEIT,                    Case No.  C 09-5000 JCS

10          Plaintiff(s),

11     v.                                   **ORDER RE: MOTIONS FOR SUMMARY**
                                            **JUDGMENT**
12  TONY DENNIS, ET AL.,                    **[Docket Nos. 157, 173, 187, 188]**

13          Defendant(s).
    _____/
14

15

16  **I.      INTRODUCTION**

17          Plaintiff Jonathan Buckheit (hereafter "Plaintiff") filed this action, alleging federal and state

18  law claims arising out of his arrest following a domestic dispute at his home on October 19, 2008.

19  Defendants are the Town of Atherton, Atherton Police Officers Tony Dennis, Dean DeVlugt, and

20  Anthony Kockler, and Defendant County of San Mateo.[1]  Before the Court are Motions for summary

21  judgment filed by all parties to this action: 1) a Motion for Summary Judgment filed by the Town of

22  Atherton (hereafter "Town"); 2) a Motion for Summary Judgment filed by the County of San Mateo

23  (hereafter "the County"); 3) a Motion for Summary Judgment filed by the individual officer

24  Defendants Tony Dennis, Dean DeVlugt and Anthony Kockler ("Officer Defendants"); and 4) a

25  Motion for Summary Judgment filed by the Plaintiff.

26

27

28

_____
[1]The parties have consented to the jurisdiction of this Court under 28 U.S.C. § 636(c).

United States District Court

For the Northern District of California

Defendant Town of Atherton's Motion is GRANTED; the Individual Officer Defendants' Motion is GRANTED; the County of San Mateo's Motion is GRANTED; and the Plaintiff's Motion is DENIED.

## II.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### A.      The Domestic Dispute and Arrest of Plaintiff

On October 19, 2008, Plaintiff, an Atherton resident living at 34 Selby Lane, telephoned "911" in order to seek the aid of the Atherton Police Department regarding a dispute with his then girlfriend ("CV-1") because she had bitten him.  JSUF 2, 9.  Atherton Police Officers Dennis and DeVlugt reported to Plaintiff's home in response to the call.  JSUF 10.  The officers separated Plaintiff and CV-1 and interviewed them individually.  JSUF 11.  Officer Devlugt interviewed the girlfriend's 9-year-old child ("CV-2") separately.  JSUF 11.

Plaintiff and his girlfriend had just signed a separation agreement wherein Plaintiff agreed to pay his girlfriend $30,000.00.  JSUF 12.  They argued that night over who would take custody of the original document.  *Id.*  Plaintiff held the agreement and CV-1 tried to grab the agreement out of his hand.  JSUF 13.  CV-1 stood up from her chair to get leverage and began pulling and grabbing to get the agreement, which was rolled up in Plaintiff's hands.  JSUF 14.  Plaintiff said that they "somehow ended up on the floor."  JSUF 15.  Plaintiff said at the time of the incident, that he did not know for sure how it happened.  *Id.*  At the time of the incident, Plaintiff thought that one of them may have tried to lower themselves in order to get leverage and they fell.  JSUF 16.  Plaintiff described the incident as a "tug-of-war with the agreement."  JSUF 17.  Plaintiff said that he began to "gain the upper hand" in the tug of war and CV-1 bit him.  JSUF 18.  Plaintiff described the bite as "a lighter bite, heavy enough to cause a mark."  *Id.*  At the time of the incident, Plaintiff did not recall which hand she bit.  JSUF 19.  Plaintiff recalls that he yelled out to CV-1 words to the effect of: "What the hell are you doing?" and CV-1 released her hold on his hand.  JSUF 20.  Plaintiff said that CV-1 bit him on the hand for a second time "really hard" for about five or six seconds.  JSUF 21.  Plaintiff yelled out in pain "stop it, your [sic] breaking my skin!"  JSUF 22.

---

[2] The following facts are taken largely from the parties' Joint Statement of Undisputed Facts ("JSUF") unless otherwise noted.

Officer Devlugt, not Officer Dennis, interviewed CV-1 and observed her during this incident. JSUF 44. Officer Devlugt found CV-1 in her office at the residence. JSUF 45. Officer Devlugt states in his declaration that he separately interviewed CV-1 and CV-2. Declaration of Dean DeVlugt ("DeVlugt Decl."), Dkt. No. 182, ¶ 4. Officer DeVlugt located CV-1 in her office; she was wearing pajamas. JSUF 45, 47. CV-1 told Officer DeVlugt that she had just finished signing separation papers with Plaintiff. JSUF 50. According to Officer DeVlugt, CV-1 told him that she and Plaintiff had been struggling for control of the separation papers. JSUF 53; DeVlugt Decl., ¶ 9. CV-1 stated that Plaintiff had thrown her to the floor. DeVlugt Decl., ¶ 10. CV-1 told Officer DeVlugt that they struggled for possession of the papers for about five minutes. JSUF 55; DeVlugt Decl., ¶ 11. CV-1 called out for her son, CV-2. JSUF 56; DeVlugt Decl., ¶ 12. CV-1 told Officer DeVlugt that during this time, Plaintiff pinned her down, face down, on the floor and had his hands around her neck. *Id.*, ¶ 13. CV-1 stated that she bit Plaintiff once on each hand in order to break free and that he bit her on the back during the struggle. *Id.*, ¶¶ 14, 15. CV-1 told Officer DeVlugt that Plaintiff kicked her on the torso as well. *Id.,* ¶ 16. CV-1 told Officer DeVlugt that the struggle ended when CV-2 arrived in the office. *Id.*, ¶ 17. CV-1 explained to Officer DeVlugt that she and Plaintiff had lived together for about 6 or 7 years, and had spent four of those years living at 34 Selby Lane, but that they were now in the process of ending their cohabitation. *Id.*, ¶¶ 20-22. CV-1 showed Officer DeVlugt her injuries, which included scratches on her forearms, redness to her upper chest, and redness to her back caused by Plaintiff biting her. *Id.*, ¶ 24. Officer DeVlugt states that in addition to observing these injuries, he also observed red marks on CV-1's neck, which substantiated CV-1's claim Plaintiff had had "his hands around her neck." *Id.*, ¶¶ 25, 26. Officer DeVlugt photographed CV-1's injuries, which were attached to his police report. *Id.,* ¶ 27, Exhibit A. CV-1 declined medical attention for her injuries. JSUF 62.

Officer DeVlugt next interviewed CV-2, the biological son of CV-1. JSUF 71. CV-2 was upstairs when he heard CV-1 call for him. JSUF 72. CV-2 told Officer DeVlugt that when he came into the room, he observed his mother face down on the floor with Plaintiff pinning her with his foot. DeVlugt Decl., ¶ 30. CV-2 also stated that Plaintiff was choking CV-1. *Id.*, ¶ 31. CV-2 kicked Plaintiff. JSUF 75; DeVlugt Decl., ¶ 32. CV-2 told Officer DeVlugt that Plaintiff is not his biological father. DeVlugt Decl., ¶ 33. CV-2 further stated that he was not physically injured by

3

either party, but that he did not feel safe alone with Plaintiff that night. *Id.*, ¶¶ 34, 35. CV-2 told Officer DeVlugt that he felt 100% safe alone with CV-1. *Id.*, ¶ 36.          Officer DeVlugt discussed the incident, witness statements, his observations regarding the demeanor of the witnesses with Officer Dennis.

Plaintiff agrees that CV-1's minor child came into the room and kicked Plaintiff a couple of times (not hard) about his buttocks. JSUF 23. Plaintiff said that he thought to himself "the hell with this" and released the agreement from his hands to CV-1. JSUF 23. Plaintiff asked CV-1, what's this all about? I just want to make a copy?" JSUF 24. CV-1 said that she was leaving and would give Plaintiff a copy later. JSUF 25. Plaintiff told CV-1 that it was an agreement that they both signed and that he wanted to make a copy. JSUF 25. CV-1 said "no" and walked upstairs with CV-2. *Id.* Plaintiff either followed CV-1 or came upstairs a minute later. Plaintiff again asked CV-1 to make a copy and she said "no." *Id.*

Plaintiff emphasized that at no time did he choke or attempt to choke CV-1. JSUF 26. Plaintiff said that he could not have choked CV-1 while they were struggling because there was no opportunity as both of their hands were grasping the agreement. JSUF 27. Plaintiff said that CV-1 has threatened him with calling the police in the past. JSUF 28. CV-1 would say that he assaulted her. *Id.* CV-1 has never actually called the police. *Id.* Asked if incidents of this nature had occurred in the past, Plaintiff said that none to this extent had occurred. JSUF 29. Plaintiff said that CV-1 had pushed him in the past during arguments when she was simply trying to push him out of the way. Plaintiff said that the police were never involved in prior incidents. *Id.*

At 23:40, Officer Dennis read Plaintiff his *Miranda* rights. JSUF 30. Plaintiff acknowledged his rights and continued speaking with the officers, never invoking his right to stop the interview. JSUF 31. After being advised of his rights, Plaintiff continued making statements. *Id.* Plaintiff said that some how both he and CV-1 ended up on the floor with both parties still grabbing at the agreement. JSUF 32. At the time of this interview, Plaintiff was unsure how they ended up on the floor. *Id.* Plaintiff reported that CV-1 proceeded to bite Plaintiff on one of his hands (not sure whether it was the left or right hand). JSUF 33. Plaintiff described the bite as forceful, and lasted less than five seconds. *Id.* Plaintiff told CV-1 words to the effect of "C'mon, this is ridiculous! I just want to make a copy of the agreement." JSUF 34. CV-1 then bit Plaintiff on the other hand

United States District Court

For the Northern District of California

(again, not sure if it was the left or right hand) and Plaintiff said that he screamed out in pain.  JSUF 35.  Plaintiff said that this bite was more forceful than the first and lasted about five or six seconds before she released her hold.  *Id.*  Plaintiff remembers seeing blood as a result of the injury.  *Id.*  Plaintiff stood up and released the agreement from his hands to CV-1.  JSUF 37.  Plaintiff admitted during the struggle that his hands were near the proximity of CV-1's head with the agreement in both of their hands only because CV-1 bit him on his hands.  JSUF 38.  Plaintiff stated at no time did he attempt to choke/strangle CV-1.  JSUF 39.  Plaintiff stated it was impossible for him to choke CV-1 because both of their hands were locked on the agreement during the struggle.  *Id.*  Plaintiff called the police department.  JSUF 40.  Plaintiff told CV-1 that the police were on their way.  *Id.*  CV-1 told Plaintiff that he would be the one arrested because CV-2 would back up what she said.  *Id.*  Officer Dennis recorded the injuries sustained by Plaintiff as:  "A visible bite mark to the top of his right hand; a second scratch (approximately 1" in length) on the lower palm portion of his left hand (BUCKHEIT said he felt some soreness on his hands as a result); an approximate 4" scratch visible on the right side of his face.  Buckheit said he noticed no pain on his face.  BUCKHEIT declined medical attention and said he would follow-up on his own if necessary."  JSUF 41.  Plaintiff's injuries were photographed and downloaded into the case.  JSUF 42.  The photographs downloaded accurately depict how Plaintiff looked when the photographs were taken.  JSUF 43.

The officers discussed the case with each other and also called their off-duty supervisor, Anthony Kockler.  *Id.*, ¶¶ 40, 41.  Officer DeVlugt determined that Plaintiff had been the dominant aggressor based upon his observations of the witnesses, their statements and the injuries he observed.  *Id.*, ¶ 42.  Officer DeVlugt states in his declaration that the wounds to Plaintiff's hands were inconsistent with his statement that he had been holding the agreement with both hands while they were struggling and did not release his grip on it until CV-2 kicked him.  *Id.*, ¶43.  Officer DeVlugt determined that the wounds were more consistent with CV-1's statement that she bit Plaintiff's hands in order to break free from being pinned down on the floor by Plaintiff.  *Id.*, ¶ 43.  Officer DeVlugt recorded Plaintiff's height and weight as 5'10" tall and 165 pounds.  JSUF 85.  The records check of CV-1 indicated that she was 5'8" tall and weighed 135 pounds.  JSUF 86.  The officers used the height/weight differential, and the observation that Plaintiff was physically larger

United States District Court

For the Northern District of California

1   than CV-1 as a factor in their determination that Plaintiff was the primary aggressor and thus

2   arrested him instead of CV-1.  JSUF 87.

3         After conducting an investigation, Defendants arrested Plaintiff for violating California

4   Penal Code Section 273.5 against CV-1 (willfully inflicting on a spouse or co-habitant corporal

5   injury resulting in a traumatic condition).  Plaintiff was placed into handcuffs by Officer DeVlugt.

6   JSUF 90.  Officer DeVlugt obtained an Emergency Protective Order (EPO) from San Mateo County

7   Judge Karesh at 23:00 p.m.  JSUF 91.  Plaintiff was transported from the Atherton Police Station to

8   the Redwood City County Jail at 03:21 am.  JSUF 92.  Plaintiff was booked into jail for only one

9   count of 273.5, not two.  Kockler Decl., ¶ 13;  Declaration of Joseph C. Howard ("Howard Decl."),

10  Dkt. 158; Exh. B, Kockler Deposition at 49:22-23.  Plaintiff was released from jail and returned to

11  the Atherton Police station via taxi where he requested a civil standby so that he could go to his

12  residence to get some of his possessions and move out of the house.  JSUF 93.  Officers Dennis and

13  DeVlugt were the only officers on duty at that time, 4:00 a.m.  JSUF 94.  Officer DeVlugt had

14  telephoned CV-1 and visited her at Plaintiff's residence in the two hours prior to the 4:00 a.m.

15  refusal of the Officers to do the civil standby.  JSUF 100.  The Officers advised Plaintiff that he

16  could return to the police station during normal business hours in order to do a civil standby.  JSUF

17  101.  Plaintiff called for a taxi.  JSUF 102.  Plaintiff said that he wanted to speak to the captain, but

18  the Officers explained that they were the only officers on duty at that hour.  JSUF 103.  Plaintiff told

19  the Officers that he would speak to the City Council to complain about Officer Dennis and Officer

20  DeVlugt and did not believe that his $60,000 in property taxes was being utilized properly.  JSUF

21  104.

22        **B.      The Creation of the Police Report by Officers DeVlugt and Dennis**

23        At 1:31 a.m. on October 19, 2008, Officer Dennis started creating the police report through a

24  computer program used by the police department called RIMS.  JSUF 105, 106.  He finished his

25  edits to the report at 10:20 p.m. on October 20, 2008.  *Id.*  Officer DeVlugt started creating and

26  editing the same police report at 1:59 a.m. and finished his edits to it at 10:14 a.m. on October 20,

27  2008.  JSUF 107.  Supplement 1 to the police report concludes with a section for

28  "Recommendations."  JSUF 111.  The Recommendations section reads:  "A copy of this case will be

    forwarded to the San Mateo County District Attorney's Office for review/prosecution of suspect

United States District Court

For the Northern District of California

BUCKHEIT for 273.5 PC- Domestic Violence against both CV-1 and CV-2." *Id.* There is no dispute in this case that this portion of the police report was in error, as there was never a basis to charge Plaintiff with domestic violence against CV-2, the minor child. There is no dispute that CV-2 was not physically injured in this altercation.

The RIMS program requires officers to identify the crime committed and to classify persons in the report as "victim," "suspect" or "witness." JSUF 118. The information gathered and transmitted to the FBI for Uniform Crime Reporting (UCR) purposes does not contain the identity of individuals arrested. Declaration of Sherman Hall ("Hall Decl."), Dkt. 177, ¶13. This information was not transmitted to the district attorney, nor was it made public. *Id.*, ¶14. The RIMS application also requires a selection of a "means of attack" as to each person designated as a victim of California Penal Code 273.5. JSUF 124. UCR statistics reporting is a Records Department Function. *Id.*, ¶16. "Police officers had no training in the UCR distinction between 'Physical/Strong arm' and 'Simple/Not Aggravated Assault.' Improper selection[s] are later rectified by a Records Department employee." *Id.* In this case, before the "means of attack" portion was transmitted to the FBI, it was changed by a Dispatch/Records Department Clerk, Janelle Miller from "Physical/Strong arm" to "Simple/Not Aggravated Assault*." Id. ¶ 20.*

DeVlugt initially entered the child into the RIMS report at 2:14 a.m., designating him as a "witness." JSUF 119. DeVlugt changed the designation of the child in the RIMS report to "CP" or "confidential person" at 5:25 a.m. JSUF 120. At 10:08 am, DeVlugt again changed the designation of the child in the RIMS report to "CV" or "confidential victim." JSUF 122. Once Officer DeVlugt changed the designation of the child to "confidential victim," the RIMS system forced DeVlugt to select a means of attack to correspond to the 273.5 charge. Officer DeVlugt chose "physical/strong arm." JSUF 125. Because the officers selected the "confidential victim" designation, the RIMS application leaves the "means of attack" field on the narrative police report blank. *Id.*; Hall Decl., ¶ 18. The terms "robbery" and "assaults" that appear next to the "means of attack" field are examples that appear in all police reports. *Id.*, ¶19.

On October 20, 2008, Sergeant Kockler reviewed and then approved the police report as part of his approval process. JSUF 128, 129. He approved the report, and despite the error in the "Recommendation" section that the case would be referred for prosecution for violation of 273.5 as

against both CV-1and CV-2.  JSUF 130.  Sergeant Kockler testified at his deposition in this case that ". . . as soon as Mr. Buckheit put his hands around his girlfriend's neck and had her pinned to the ground and her son had to come down and intervene, at that point that's when Mr. Buckheit becomes a primary aggressor and was rightfully arrested for 273.5 of the Penal Code."  Howard Decl., Exh. B, Kockler Depo. at 80:15-21.

Prior to the factual innocence hearing in December 2009, Officers Dennis, DeVlugt and Kockler met with the district attorney and became aware of the error in the police report recommending prosecution of PC 273.5 as against both CV-1 and CV-2.  Howard Decl., Exh. A, Dennis Depo. at 100:21-101:4; Exh. B, Kockler Depo. at 177:8-18; DeVlugt Decl.,¶ 68.  Officer Dennis declares that he does not recall writing a recommendation that the district attorney review or prosecute Plaintiff for the crime of domestic violence against the child, CV-2. Dennis Decl., ¶ 54. Dennis declares that when he wrote the Recommendations section of his police report, it was his intent that the district attorney review the case for prosecution of Plaintiff for violating 273.5 as to CV-1 only, given that Plaintiff was arrested solely for domestic violence against CV-1.  Dennis Decl., ¶ 56.  Because Plaintiff was taken into custody, the police report of his arrest had to be completed prior to Dennis and DeVlugt going off duty that day.  *Id.*, ¶ 52.

**C.    The Report to Child Protective Services & Decision Not to Prosecute Plaintiff**

On October 20, 2008 at 9:25 p.m., Officer Dennis contacted Michelle Levynh of San Mateo County Child Protective Services (hereafter "CPS").  JSUF 126.  Officer Dennis had concerns regarding CV-2's involvement in this case.  Dennis Decl., ¶ 57.  Because the nine-year-old child was in the home at the time of the incident and was called downstairs and intervened in the physical altercation, Officer Dennis believed that the child had been in jeopardy of sustaining physical injury. *Id.*, ¶ 59.  CV-2 was interviewed by Officer DeVlugt, who informed Officer Dennis that CV-2 had reported that he did not feel safe in the home alone with the Plaintiff.  *Id.*, ¶ 60.  Officer Dennis was of the opinion that a nine year old child should not be placed into such a situation and that his living arrangement might need to be examined. *Id.* ¶ 59.  The CPS referral form was the only method available to Officer Dennis to obtain CPS' involvement so that someone could check on CV-2's mental welfare.  Howard Decl., Exh. B, Kockler Depo. at 109:10-13; Exh. A, Dennis Depo. at 176:18-19; 168:10-20.  The CPS referral form states under the heading "Nature of Injuries,"

"NONE."  Dennis Decl., ¶ 58.  Officer Dennis completed a report of this incident to CPS, which was forwarded to Levynh's attention along with a copy of the police report.  JSUF 127.

There is no dispute in this case that Child Protective Services declined to investigate the matter.  Howard Decl., Exh. B, Kockler Depo. at 179:1-13.  CPS found the report involving Plaintiff and CV-1 and CV-2 to be "inconclusive."  Plaintiff does not offer evidence that CPS ever forwarded Plaintiff's name for inclusion in the California Child Abuse Index (CACI).  Rather, Plaintiff himself states that his name was placed in the CACI.  *See* Declaration of Jonathan Buckheit ("Buckheit Decl."), Dkt. 191 at ¶13.  He argues that "by operation of law, CPS was obligated to forward the report to DOJ, for inclusion in the CACI" due to the fact that the report was found to be "inconclusive" rather than "unfounded."  Plaintiff argues that a reasonable inference can be drawn that the report listing Plaintiff as a suspect of mental child abuse was forwarded to DOJ and included in the CACI.  Defendants have proffered evidence that the Atherton Police Department did not report Plaintiff (or anyone else) to the California Department of Justice (the "DOJ") to be listed on CACI in connection with the investigation documented in Atherton Police Report Number 08-634, the report generated in connection with the October 19, 2008 incident.  *See* Declaration of Joseph Wade ("Wade Decl."), ¶¶ 3-5.  Similarly, the Defendants have put forward evidence that CPS did not report Plaintiff or anyone else to the DOJ for listing on CACI in connection with the referral of child abuse allegations at issue in this case.  *See* Declaration of Jennifer Shaw ("Shaw Decl."), ¶ 5.

### D.   The Plaintiff's Efforts to Obtain the Police Report and Declaration of Factual Innocence

On October 29, 2008, the San Mateo County District Attorney's Office sent a fax to the Atherton Police indicating that it had declined to prosecute the case.  JSUF 136.  On November 11, 2008, Plaintiff filed a citizen's complaint against Officer DeVlugt claiming, *inter alia*, that the officer was rude to him in connection with the events at 34 Selby Lane.  JSUF 137.

On November 24, 2008, Plaintiff made a Public Records Act request for a copy of the police report ro the Town of Atherton.  JSUF 138.  On December 8, 2008, the Town of Atherton informed Plaintiff that the police report was not subject to disclosure pursuant to Government Code Section 6254(f).  JSUF 139.  On December 15, 2008, Atherton Police Chief Glen Nielsen sent

United States District Court

For the Northern District of California

1   correspondence to Plaintiff informing him that his allegations against Officer DeVlugt were not

2   sustained or unfounded.  JSUF 140.

3         On April 2, 2009, Plaintiff filed a Petition for Writ of Mandate in the San Mateo County

4   Superior Court to compel production of the police report from Atherton and San Mateo County

5   under California Government Code § 6250 *et. seq.*  JSUF 141.  The Town did not respond to or

6   oppose the writ.  *Id.*  On April 22, 2009, before the deadline to respond to the writ, the Town

7   provided Plaintiff with a redacted version of the police report.  *Id.*  In June of 2009, the Town

8   provided Plaintiff with the entire police report and paid him $7,922.50 for his attorney's fees

9   incurred in bringing the writ.  *Id.*

10        In October 2009, Plaintiff filed a Petition for Factual Innocence in the San Mateo County

11   Superior Court.  Declaration of Robert E. Carey Jr., ("Carey Decl.") ¶ 7.  The factual innocence

12   hearing lasted two full days, December 12, 2009 and January 12, 2010.  *Id.*, ¶ 8.

13        The present federal lawsuit was filed in this Court on October 20, 2009.  The Plaintiff filed a

14   Second Amended Complaint on June 18, 2010.

15        On January 12, 2010, the San Mateo County Superior Court granted Plaintiff's application

16   for a finding of factual innocence.

17        **E.     The Summary Judgment Motions**

18              **1.     The Individual Atherton Police Officers' Motion**

19        The Officers move for summary judgment of all claims against them on several grounds.

20   First, the Officers argue that there was probable cause to arrest the Plaintiff for four separate

21   batteries against CV-1 under California Penal Code § 242, and for child endangerment under

22   California Penal Code § 273a(b) due to the fact that a minor child had been involved in a physical

23   altercation between two adults.  Second, the Officers argue that all of Plaintiff's state law claims are

24   barred by state statutory privileges and immunities.  Specifically, the Officers argue that their

25   emergency application for a protective order was privileged under California Penal Code § 47(b) and

26   that their report to Child Protective Services was privileged because they were "mandatory

27   reporters" under California Penal Code § 11172(a).  Third, the Officers argue that the Plaintiff's

28   defamation claims fail because the Plaintiff is unable as a matter of law to establish the falsity of the

statements.[3]  Fourth, the Officers argue that the gender discrimination claim fails because there is no evidence of any discriminatory intent or motive.  Fifth, the Officers argue that the conspiracy claim fails as a matter of law because there is no evidence to support it.  Sixth, the Officers argue that the Plaintiff lacks standing to pursue his claims of discriminatory "recommendation for criminal prosecution" and false reporting of him to CPS because the injuries he claims to have suffered are not sufficiently concrete and because the harm he alleges to have suffered never occurred – Plaintiff was not placed in the California Child Abuse Central Index (CACI) nor was he prosecuted criminally.  Seventh, the Officers argue in their Motion that the First Amendment claim fails as a matter of law due to the absence of any evidence of retaliatory motive.  Eighth, the Officers argue that they are entitled to qualified immunity from suit because there have been no underlying constitutional violations.  Finally, the Officers argue that Defendant Kockler was not involved in the investigation or arrest and is therefore entitled to summary judgment on that basis alone.

Plaintiff opposes the Motion.  Plaintiff argues that there was no probable cause to arrest him for any crime.  Second, Plaintiff argues that the Defendants are not entitled to summary judgment as to whether they had probable cause to arrest Plaintiff for child endangerment.  Third, Plaintiff argues that genuine issues of material fact exist as to the question of whether Defendants violated his constitutional right to Equal Protection when he was arrested because of his gender.  Fourth, Plaintiff asserts that genuine issues of material fact preclude summary judgment on the question of whether the Officers retaliated against Plaintiff for exercising his First Amendment right to petition the government to seek redress for his grievances.  Finally, Plaintiff argues that there is a genuine dispute on the question of whether Sergeant Kockler's acts or omissions proximately caused

---

[3]There is no defamation claim in this case because the Court ordered all defamation allegations stricken from the Complaint on May 18, 2010 in its Order Granting in Part and Denying in Part the Defendants' Motions to Dismiss.  *See Buckheit v. Dennis*, 713 F.Supp.2d 910, 919-920 (N.D. Cal., May 18, 2010).  There is no defamation claim in the Second Amended Complaint.  In addition, Claims 9 and 10 have been dismissed by this Court previously.  The Court dismissed Claim 9 against the County, an alleged violation of duties under *Brady v. Maryland*, 373 U.S. 83 (1963).  *See* Dkt. No. 74.  On March 4, 2011, this Court granted Defendant Jerry Carlson and the Town's Motion for Summary Judgment as to Claim 10 (First Amendment retaliation as a result of Plaintiff not being appointed to the Atherton Town Council).  *See* Dkt. 116.

1   Officers Dennis and DeVlugt to violate his constitutional rights and whether Sergeant Kockler

2   retaliated against Plaintiff.

3              **2.      The Town of Atherton's Motion**

4         Defendant Town of Atherton moves for summary judgment as to all claims for relief.  In

5   particular, the Town argues first that Plaintiff's claims under 42 U.S.C. § 1983 fail as a matter of law

6   because the Town is not vicariously liable under a theory of *respondeat superior* for the actions of

7   its individual officers.  Second, the Town argues that no violation of the Plaintiff's equal protection

8   rights occurred because the undisputed facts demonstrate that the officers arrested Plaintiff after

9   determining that he was the dominant aggressor, not because he was male.  Third, the Town argues

10  that the report to child protective services does not constitute a cause of action under 42 U.S.C. §

11  1983 as a matter of law and fourth, that temporarily withholding a police report from Plaintiff did

12  not interfere with his right under the First Amendment to petition for redress of grievances and thus

13  fails as a matter of law.  Finally, the Town argues that Plaintiff has no evidence to support his claim

14  that the Town retaliated against him for exercising his constitutional rights.

15        Plaintiff opposes the Town's Motion.  Plaintiff argues first that genuine issues of material

16  fact remain as to whether or not the Town is liable under *Monell* for the violations of the individual

17  officers, and whether Defendant Anthony Kockler acted as a final policy maker for the Town in

18  approving Plaintiff's arrest and the resulting police report.  Second, Plaintiff argues that a genuine

19  issue of material fact exists as to whether or not the Town is liable under *Monell* for the

20  constitutional violations arising out of report to child protective services (CPS).  Third, Plaintiff

21  argues that there are genuine issues of material fact on the question of whether Plaintiff's arrest was

22  the result of gender discrimination thus precluding summary judgment on the Equal Protection

23  claim.  Fourth, Plaintiff argues that the act of reporting to CPS is sufficient under the Ninth Circuit

24  case *Humphries v. County of Los Angeles*, 554 F.3d 1170  (9th Cir. 2009) or as an act of retaliation

25  against Plaintiff for exercising his First Amendment right to petition the government for redress of

26  his grievances.  Fifth, Plaintiff contends that the act of withholding a police report for a period of

27  more than six months resulted in additional attorney's fees and costs (and emotional distress)

28  because it forced Plaintiff to petition the superior court for a judicial finding of factual innocence.

Sixth, Plaintiff argues that Plaintiff has come forward with sufficient evidence of retaliation to defeat

**United States District Court**
For the Northern District of California

1   summary judgment on his retaliation claim.  Finally, Plaintiff argues that the Town is collaterally

2   estopped from re-litigating issues that were decided by the judge at the factual innocence hearing.

3               **3.      The County of San Mateo's Motion**

4        Defendant San Mateo County moves for summary judgment of each of the claims against it

5   in the Second Amended Complaint ("SAC").  Specifically, Defendants argue that there is no

6   evidence to support Plaintiff's allegations that: 1) the County, through agreements regarding policy

7   and training related to domestic violence incidents, controlled the Atherton police officers who

8   wrongfully arrested him (the Third and Fourth Claims) and (2) the County unconstitutionally, and in

9   conspiracy with Atherton, withheld a copy of the police report regarding the October 19, 2008 arrest

10  in order to prevent Plaintiff from exercising his First Amendment rights (the Seventh Claim and part

11  of Eighth Claim).  The County argues that there are no disputed issues of material fact and Plaintiff

12  cannot establish the elements necessary to prevail on any of his claims against the County.

13       The Plaintiff opposes the Motion.  Plaintiff argues that under a proximate cause analysis the

14  appropriate question is not whether the County exercised control over the Atherton police officer,

15  but rather, whether the County's acts or omissions proximately caused the Atherton police officers

16  to act.  Plaintiff argues that it was reasonably foreseeable that the training provided by the County to

17  the Atherton police officers would influence or proximately cause the officers to act in conformity

18  with the County's training.  Plaintiff also argues that the San Mateo County's "Domestic Violence

19  Protocol for Law enforcement" uses size and strength difference in order to determine who was the

20  dominant aggressor in a domestic violence situation, and that this policy therefore discriminates

21  against males because males are usually larger than females.  Plaintiff argues that a genuine issue of

22  material fact exists on the question of whether the County's failure to provide Plaintiff with a copy

23  of the police report interfered with his rights to petition the government for redress of his grievances.

24  Plaintiff disputes the County's assertion that it did not have a copy in its possession to provide to

25  Plaintiff and therefore cannot be liable.  Plaintiff argues that this is precisely the sort of factual

26  dispute that precludes summary judgment.  Plaintiff also argues "given that the Atherton Police

27  Department and SMC District Attorney's Office were both charged with the statutory duty to

28  determine whether or not Mr. Buckheit should received [sic] an administrative determination of

factual innocence. . . it is a reasonable inference that SMC's refusal to provide a copy of the police

United States District Court

For the Northern District of California

1  report resulted from an agreement between the Atherton Police Department and the SMC District

2  Attorney's Office." Pl.'s Opp. to County's Motion at 7, Dkt. 244. Finally, Plaintiff argues that "the

3  issue of whether or not Mr. Wagstaffe had the police report when requested, etc., is really just a red

4  herring in all of this, since . . . San Mateo County had an affirmative duty under applicable case law

5  to pro-actively notify Plaintiff that child abuse charges had been filed against him." *Id.*

6            **4.      The Plaintiff's Motion**

7            Plaintiff moves for summary judgment against all Defendants on the first and second claims

8  for relief as pled in the Second Amended Complaint on the grounds that collateral estoppel applies

9  to preclude the Defendants from re-litigating issues or claims regarding probable cause to arrest

10  Plaintiff as a result of the factual innocence determination in Superior Court. Plaintiff asserts that

11  the Defendants should be precluded from presenting a defense at trial regarding the lawfulness of the

12  arrest of Plaintiff.

13             Further, Plaintiff moves for summary judgment on the grounds that there are no disputed

14  facts regarding the seventh claim for relief (§ 1983 claim for retaliation against the Town of

15  Atherton and County of San Mateo), and that this Court should find, as a matter of law, that the

16  Defendants Town and County violated Plaintiff's substantive due process and First Amendment

17  rights in connection with their refusal to provide and/or delay in providing Plaintiff with a copy of

18  the police report relating to Plaintiff's arrest. Defendants oppose the Plaintiff's Motion.

19  **III.     ANALYSIS**

20            **A.      Legal Standard – Motion for Summary Judgment**

21            Summary judgment is appropriate where "materials in the record, including depositions,

22  documents, electronically stored information, affidavits or declarations, stipulations (including those

23  made for purposes of the motion only), admissions, interrogatory answers, or other materials" show

24  that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

25  as a matter of law. Fed.R.Civ.P. 56(a), (c)(1)(A). In order to prevail, a party moving for summary

26  judgment must show the absence of a genuine issue of material fact with respect to an essential

27  element of the non-moving party's claim, or to a defense on which the non-moving party will bear

28  the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further,

    "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that

**United States District Court**
For the Northern District of California

party must show *affirmatively* the absence of a genuine issue of material fact," that is, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citations omitted). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254 (1986).

> **B.   Whether Plaintiff Was Arrested on Account of his Gender (Claims 1 & 2 - 42 U.S.C. § 1983 – Equal Protection – Against Officer and Town Defendants)**

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the law." U.S. Const. Amendment XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Where disparate treatment of a group is shown, the level of scrutiny to which the state's action is subjected depends upon the type of group classification at issue. *Id.* at 439-443.

In order to state a claim for violation of the Equal Protection clause of the Fourteenth Amendment, a plaintiff must allege that the individual defendants, acting under color of state law "acted in a discriminatory manner and that the discrimination was intentional." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (citation omitted). A "long line of Supreme Court cases make clear that the Equal Protection clause requires proof of discriminatory *intent* or *motive*." *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (citations omitted). Moreover, as pertinent here, the Equal Protection clause protect males as well as females against gender discrimination by state officials. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 733 (1982) (holding that policy of excluding males from school of nursing violated the Equal Protection Clause). A plaintiff must prove two elements before he may be entitled to relief under the Fourteenth Amendment : 1) discriminatory effect; and 2) discriminatory purpose. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) and *Washington v. Davis*, 426 U.S. 229 (1976), a challenge based on "discriminatory effect" failed due to plaintiffs' inability to establish the existence of a discriminatory purpose. In *Arlington Heights*,

1    the Court found no evidence that the city intended to discriminate against racial minorities by

2    refusing to re-zone property from single-family to multiple-family units, even though most

3    minorities can only afford multiple-family units.  The Court explained in *Washington v. Davis*, that

4    "disproportionate impact is not irrelevant, but is not the sole touchstone of an invidious racial

5    discrimination forbidden by the Constitution." *Id*. at 242.  Thus, to state a claim for denial of equal

6    protection, the Plaintiff must show that he was treated differently from persons similarly situated or

7    that the defendants acted with an intent to discriminate against him based on his membership in a

8    protected class. *Id*. at 239-40; *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

9          Plaintiff alleges that he was arrested "solely or primarily on the basis of [his] gender (a male)

10   for illegal discriminatory purposes, without any regard to the true facts and evidence presented by

11   the situation." SAC ¶ 14.  As evidentiary support for this claim, Plaintiff points to the statements of

12   Officer Dennis and DeVlugt that they had trouble initially determining who was the dominant

13   aggressor, that their original intent had been to arrest CV-1, but that after discussing the matter with

14   Defendant Kockler, they arrested the Plaintiff instead.  Plaintiff also relies heavily upon Defendants'

15   admission that the determination that Plaintiff was the dominant aggressor had been based, in part,

16   upon the fact that he was physically larger and stronger.  Pl.'s Opp. to Officer Motion at 20 (citing

17   Declaration of Jerry Fong, ¶¶ 29, 23).  Plaintiff argues that statements made by Officer Dennis and

18   DeVlugt give rise to a reasonable inference that their decision to arrest Plaintiff was based on an

19   intent to discriminate against males or shows a deliberate indifference to the discriminatory

20   practice's impact on males.  *Id*.

21         Plaintiff also cites to the opinions of his two experts, Richard Felson and John Hamel, that

22   enforcement of the Town of Atherton's Domestic Violence Policy, as well as the San Mateo County

23   Domestic Violence Protocol for Law Enforcement (in particular, the use of size and strength to

24   determine the dominant aggressor) discriminates against males, who are usually larger and stronger

25   than the female counterpart in a domestic violence situation.  *Id.* (citing Fong Decl., ¶ 20, 21).

26         The Court is not persuaded by the Plaintiff's arguments.  Plaintiff argues that the Town of

27   Atherton's policy has a discriminatory impact on males because it is more likely that they will be

28   arrested due to the likelihood that they will be the larger person in a domestic violence situation

     involving a man and a woman, and that the individual Officers followed this discriminatory policy

when arresting Plaintiff on account of his gender.  Plaintiff's argument amounts to a naked claim of disparate impact.  As described below, there is no evidence of discriminatory intent, and Plaintiff's evidence of discriminatory impact is insufficient.

Where a plaintiff seeks to prove the invidious discriminatory intent element of a violation of the Equal Protection Clause through disparate impact and "the challenged governmental policy is 'facially neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee*, 250 F.3d at 686 (citing *Arlington Heights*, 429 U.S. at 264-66 (citing *Washington v. Davis*, 426 U.S. at 242)). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. at 242.  The Supreme Court explained in *Davis* that:  "[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional [s]olely because it has a racially disproportionate impact." *Id.* at 239.

One of the earliest Equal Protection cases establishes that "the effect of a law may be so harsh or adverse in its weight against a particular race that an intent to discriminate is not only a permissible inference but also a necessary one." *Flore v. Pierce*, 617 F.2d 1386, 1389 (9th Cir. 1980) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).  Indeed, there are cases where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Id.* (citing *Arlington Heights*, 429 U.S. at 266).  The law is clear, however, that "such cases are rare. Absent a pattern as stark as that in . . . *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266.

### 1.      Evidence of Disparate Impact

There can be no dispute that Atherton's Domestic Violence Policy 320 is not discriminatory on its face.  Rather, it includes several factors in "mutual combat" situations that the police are to use in order to determine who was the dominant aggressor (in order to try to avoid dual arrests).  The factors to be considered are:

a) Was one party in actual fear of the other?

United States District Court

For the Northern District of California

b) Did one party escalate the level of violence, *i.e*., did one party react to a slap by beating the other party? (Distinguish between self defense and retaliation)

c) was one party physically larger and stronger than the other?

d) Was there a history of violence by one of the parties against the other?

e) Was one party usually the aggressor?

f) Did any injuries appear to be defense wounds?

Atherton Policy Manual 320.3.3(c)(8), Frew Decl., Exh. 1.  These factors are all gender neutral on their face.  The factor relating to size is not limited to males - the officers consider the relative size of the parties regardless of the genders involved.  The policy also requires the officers to use more than a person's physical size in order to determine who was the dominant aggressor.  Absent any evidence of a policy that is facially discriminatory, Plaintiff introduces evidence of discriminatory impact in order to argue that Atherton's consideration of size as a factor will result in more arrests of males than females in mutual combat situations and that this gives rise to an inference of discriminatory intent.[4]

As evidentiary support for his argument, Plaintiff argues that his expert, Dr. Philip Stark has calculated the probability that a random male from the population is larger than a random female as 82.5% (is taller) and 58.5% (weighs more).  Plaintiff provides mathematics performed by his expert, Professor Stark, which indicates that the Atherton arrest data in mutual combat situations for the past ten years (men arrested in 16 out of 22 mutual combat situations) "can only be reconciled by assigning an 81% probability of an officer arresting a male" instead of the equal fault occurrences measured by the sociological studies of Plaintiff's other expert, Professor Felson.  Plaintiff argues: "This is about equal to the chance a male is taller than a female and provides ample evidence that the Atherton policy is causing officers to arrest males (the naturally taller gender) without regard to the true facts of the situation."  Pl.'s Opp to Town's Motion at 8, Dkt. 243.

This evidence does not demonstrate a significantly greater impact on males sufficient to justify a finding of discriminatory intent.  It shows that in approximately 72% of the incidents studied, the male was arrested in a mutual combat situation.  The Court concludes that this evidence provides some evidence of a facially neutral policy having a disparate impact on males.  It is,

---

[4]It is undisputed that CV-1 was smaller than the Plaintiff, both in height and weight.

1   however, quite weak:  it does not take into account the particular circumstances of the arrests

2   studied, and cannot show that 22 arrests is a sufficiently large sample to establish a statistically

3   significant disparity.  Standing alone, this statistical evidence would not be sufficient to sustain a

4   finding of gender discrimination.  In order for the equal protection claim to survive summary

5   judgment, Plaintiff must have some evidence from which an inference of discriminatory intent could

6   be drawn.  This weak disparate impact evidence, standing alone, is insufficient on the facts of this

7   case.

8                    **2.        Evidence of Discriminatory Intent**

9          Plaintiff argues that the officers intentionally discriminated against him, but provides no

10  evidence in support of his claim.  He argues that the Officers violated his Equal Protection rights

11  when they "refused to arrest CV-1, even though a much more compelling case can be made that

12  probable cause existed to arrest CV-1."  Pl.'s Opp. to Town's Motion at 4, Dkt. 243.  Plaintiff argues

13  that because Plaintiff's injuries were worse than CV-1's, a reasonable inference may be drawn that

14  Plaintiff was arrested due to gender discrimination.  Pl.'s Opp to Officers' Motion at 21, Dkt. 242.

15         The Court disagrees.  Drawing all *reasonable* inferences in Plaintiff's favor, the Court finds

16  no evidence of discriminatory intent.  The record in this case reveals ample evidence having nothing

17  to do with his size or gender to support the Officers' conclusion that Plaintiff had been the main

18  aggressor.  The Officers were entitled to consider CV-1's statement that Plaintiff had thrown her to

19  the ground (thereby escalating the level of violence), kicked her, and had his hands around her neck.

20  The Officers were also entitled to consider the witness CV-2's statements, and to consider Plaintiff's

21  own statement that he did not recall how he and CV-1 ended up on the ground.  DeVlugt Decl., ¶¶

22  42-43; Dennis Decl., ¶ 44.  The Officers were entitled to conclude that the Plaintiff's injuries were

23  the result of the victim defending herself, not batteries for which CV-1 must be arrested.  Even if

24  there could be a reasonable disagreement as to who was the primary aggressor the evidence is not so

25  "compelling" to justify the inference that the officer's contrary view was motivated by gender.

26  There is no evidence from which a *reasonable* inference of gender discrimination may be drawn.

27         Accepting all facts in a light most favorable to the Plaintiff, the Court finds that there is

28  ample evidence in the record to support the conclusion that the arrest was made based upon factors

    having nothing to do with gender and pursuant to a facially neutral department policy.  The evidence

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  of disparate impact, standing alone, fails to support an allegation of discriminatory intent on the part

2  of individual Officer Defendants.  Defendants' motion for summary judgment with respect to the

3  Equal Protection claim (Claim 1) against the Officer defendants is GRANTED.  Similarly, the

4  Plaintiff has offered no evidence that Atherton's policy (Policy 320) discriminates against males in

5  violation of the Equal Protection Clause.  For the same reasons discussed above, the Town's Motion

6  for Summary Judgment of the gender discrimination claim against it (Claim 2) is GRANTED.

7       **C.**    **Whether There Was Probable Cause to Arrest Plaintiff (Claims 1 & 2 - 42 U.S.C. § 1983 – Fourth Amendment – Against Officer and Town Defendants)**

8

9       Plaintiff asserts a § 1983 claim alleging a violation the Fourth Amendment.

10  Section 1983 provides:

11      Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
   State ... subjects, or causes to be subjected, any citizen of the United States or other person

12      within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
   secured by the Constitution and laws, shall be liable to the party injured . . .

13

14 42 U.S.C. § 1983.  "[A]n arrest without probable cause violates the Fourth Amendment and gives

15 rise to a claim for damages under § 1983."  *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir.

16 1988).  "Liberty is protected from unlawful state deprivation by the due process clause of the

17 Fourteenth Amendment."  *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir.1985) (*en banc*).

18      The individual officer Defendants argue in their Motion that there was probable cause to

19 arrest Plaintiff for four separate batteries.  The Court agrees.

20      Regarding the first battery (probable cause to believe that Plaintiff had thrown CV-1 to the

21 floor), although Plaintiff disputes that it happened, he does not deny that CV-1 told Officer DeVlugt

22 that Plaintiff threw her to the floor.  Plaintiff admits that he engaged in a tug-of-war struggle with a

23 woman smaller than himself.  Further, Plaintiff admits that he "did not know" how CV-1 "ended up

24 on the floor."  JSUF 15.

25      Regarding the second battery, Plaintiff does not dispute that CV-1 told Officer DeVlugt that

26 Plaintiff had bit her on the back.  He disputes her veracity.  Officer DeVlugt states in his declaration

27 (and Plaintiff offers no evidence to dispute it) that he looked at CV-1's back and saw redness

28 consistent with a bite.  DeVlugt Decl., at ¶ 25.  Plaintiff also admits that he used his mouth on CV-

   1's back (although he did not characterize it as a bite).  Buckheit Depo., at 168:14-18 ("I didn't bite

United States District Court

For the Northern District of California

her. . . I kind of mouthed her on the back with my lips over my teeth to indicate if he [sic] didn't stop I was going to have to do something to force her to stop."). Thus, it was objectively reasonable that an officer would find that this statement minimized what was in fact a bite and that probable cause that Plaintiff had bitten CV-1 existed.

Regarding the third battery, Plaintiff disputes the truth of CV-1's statements, but does not dispute the fact that CV-1 told Officer DeVlugt that Plaintiff had his hands around her neck. Plaintiff also does not dispute that CV-2 told the Officer that he saw Plaintiff choking his mother, CV-1. This is sufficient evidence of probable cause that a battery had occurred.

Finally, with respect to the fourth battery, Plaintiff does not dispute that CV-1 told Officer DeVlugt that Plaintiff had kicked her in the torso. Although Plaintiff disputes that these statements were accurate, he does not state in his declaration that he disputes that these statements were made to Officer DeVlugt. Thus, there is no genuine dispute as to the facts, as they were known to Officer DeVlugt at the time of the decision to arrest Plaintiff.

Plaintiff argues that "the arrestee's testimony which conflicted with the arresting officers' version or view of the underlying facts relating to probable cause is sufficient to create a genuine issue of disputed material fact as to whether or not the officers had probable cause to arrest the suspect. . ." *See* Pl.'s Opp. to Officers' Motion at 3, Dkt. No. 242. Plaintiff misstates the law. Indeed, Plaintiff relies almost entirely on his denials of wrongdoing and the Superior Court's factual innocence determination in order to attempt to create a genuine issue of material fact on the question of probable cause. Plaintiff also argues that collateral estoppel applies and that Defendants are barred from litigating the issue of probable cause because the issue has been previously adjudicated in the Superior Court of San Mateo during the factual innocence hearing.[5] Both arguments are incorrect. The question is not whether, in hindsight, the officers reached the right conclusion, but whether, in light of the facts known to them at the time, the officers' conduct was reasonable. "Fourth Amendment issues [ ] are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). Here, the statements made to the officers, and the physical evidence, were sufficient to justify their arrest of Plaintiff – even though Plaintiff denied assaulting CV-1.

---

[5]This issue is discussed below.

1    Plaintiff is also incorrect in his assertion that his arrest was unconstitutional because the

2    alleged batteries occurred outside the presence of the police officers and that as misdemeanors, the

3    conduct must have been committed in the presence of the officers to justify a valid warrantless

4    arrest.[6]  *See* Pl.'s Opp. at 16, Dkt. No. 242.  Plaintiff is incorrect.  The arrest in this case was for a

5    felony.  DeVlugt Decl., ¶ 46, Exh. A (police report).  California Penal Code § 836(a) authorizes

6    felony arrests upon probable cause.  Subdivision (d) permits warrantless arrests for domestic

7    batteries outside of the presence of an officer, if the arrest is made "as soon as probable cause

8    arises."  If a domestic battery results in a traumatic condition" then the crime is a felony.  Cal. Penal

9    Code § 273.5.  "Traumatic condition" is defined as "condition of the body, such as a wound or

10   external or internal injury, whether of a minor or serious nature, caused by a physical force."  Here,

11   Officer DeVlugt has proffered evidence that he observed redness consistent with a bite on CV-1's

12   back, which certainly qualifies as a wound ("minor or serious").  The Court concludes that the arrest

13   was not unlawful because there was no "presence" requirement on the facts of this case.

14   Even accepting for a moment the validity of the Plaintiff's argument – that probable cause to

15   arrest Plaintiff was lacking in this case –  the Court finds that the individual officers would be

16   entitled to qualified immunity.  "The doctrine of qualified immunity does not require that probable

17   cause to arrest exist.  Even absent probable cause, qualified immunity is available if a reasonable

18   police officer could have believed that his or her conduct was lawful, in light of clearly established

19   law and the information the searching officers possessed."  *Fuller v. M.G. Jewelry*, 950 F.2d 1437,

20   1443 (9th Cir. 1991) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Thus, as the Ninth

21   Circuit explained in *Fuller*, even if the officers were mistaken that probable cause to arrest the

22   Plaintiff existed, they are nonetheless immune from liability if their mistake was reasonable.  *Id.*

23   (citing *Anderson*, 483 U.S. at 641).  The question in this case is whether a reasonable officer could

24   have believed that his conduct was lawful, in light of clearly established law and the information he

25   available to him at the time.  *Id.*

26   Under the Fourth Amendment "[p]robable cause exists when, under the totality of the

27   circumstances known to the arresting officers, a prudent person would have concluded that there was

28

---

[6]Plaintiff's collateral estoppel argument is the subject of Plaintiff's Motion for Summary Judgment, which will be discussed in greater detail below.  As will be explained, Plaintiff's argument fails as a matter of law.

a fair probability that [the suspect] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (citation omitted). Here, the Court finds that the statements of Plaintiff that he was engaged in a tug-of-war over a document, that he did not remember how he and CV-1 "ended up on the floor," the statement of CV-2 that he saw Plaintiff choke his mother and had to kick the Plaintiff to rescue CV-1, as well as CV-1's statements, visible injuries and shaken demeanor are more than sufficient to create probable cause to arrest. Even if the Officers were mistaken about the existence of probable cause to arrest Plaintiff, the mistake was objectively reasonable, and they are entitled to qualified immunity.

> **D.   Whether the Referral to Child Protective Services Constitutes a Substantive Due Process Violation Against the Officers and the Town – Claims 5 & 6 – 42 U.S.C. § 1983**

Plaintiff asserts a cause of action under 42 U.S.C. § 1983 on the basis that the Town and individual Officer Defendants' actions of reporting the October 19, 2008 incident to CPS interfered with his civil rights. SAC Claims 5, 6. Plaintiff contends that the Officers reported him to CPS in retaliation of his "verbal protests" about the Officers' treatment of him after his arrest and that the referral to CPS can "stand alone" (presumably as a substantive due process violation) or support a claim for retaliation under the First Amendment.[7] Plaintiff argues that the Officers' referral of him to CPS put him at risk of being placed erroneously on the California Department of Justice's Child Abuse Central Index (CACI).

Relying on the Ninth Circuit's opinion in *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1175-76 (9th Cir. 2009), *reversed in part on other grounds by* — U.S. — , 131 S.Ct. 447, 178 L.Ed.2d 460 (2010), Plaintiff argues that being falsely listed in CACI implicates liberty interests. There, the plaintiffs were listed in the CACI erroneously, which hindered their ability to apply for custody of a relative's child. *Id.* at 1188. In *Humphries,* the plaintiffs were arrested for inflicting corporal injury to a child, and cruelty to a child by endangering health. *Id.* at 1181. The criminal charges were dismissed. *Id.* The plaintiffs subsequently obtained a determination of factual innocence under California Penal Code § 851.8. *Id.* The plaintiffs argued that their Fourteenth Amendment procedural due process rights were violated by their listing on the CACI. *Id.* at 1184. The district court found that the plaintiffs' listing on the CACI did not deprive them of any

---

[7]The First Amendment claims will be addressed separately below.

United States District Court

For the Northern District of California

constitutionally protected liberty interest; thus, the court did not reach the second step of the due process analysis - whether the procedures used in connection with that liberty interest were constitutionally sufficient. *Id.* at 1185. The Ninth Circuit reversed, holding that the plaintiffs had satisfied the "stigma-plus" test[8] set forth by the Supreme Court in *Paul v. Davis*, 424 U.S. 693 (1976). The Ninth Circuit agreed with the plaintiffs that the stigma of being listed in the CACI as substantiated child abusers, *plus* the statutory consequences of being listed in the CACI constituted a liberty interest, the deprivation of which may not occur without due process of law. *Id.* In *Humphries*, the court had no difficulty finding that being falsely listed in the CACI as a child abuser is stigmatizing; the more difficult question for the court was whether the plaintiffs could satisfy the "plus" portion of the test. *Id.* at 1186. In order to satisfy the second part of the "stigma-plus test" the plaintiffs were required to demonstrate that as a result of being listed in the CACI, "a right or status previously recognized by state law was distinctly altered or extinguished." *Id.* (citing *Paul*, 424 U.S. at 711). In analyzing this question, the court explained that "inclusion in the CACI alters the Humphries' legal rights or status in a variety of ways that Californians who are not listed on the CACI are not subject to: applying for custody of a relatives child, becoming guardians or adoptive parents. . ., obtaining a license for child care, becoming licensed or employed in a position dealing with children, obtaining employment as a peace-officer, and involvement in adoption and child placement." *Id.* at 1188. The court was persuaded by the plaintiffs' submission of specific evidence in the district court of how their listing in the CACI had affected them. *Id.* The court thus concluded that the listing in the CACI both stigmatizes plaintiffs and creates an impediment to the their ability to obtain legal rights. *Id.* The court noted that "an injury that results merely from simple defamation is not a constitutional liberty interest under the 'stigma-plus' test." *Id.* at 1190 (citation omitted). The court explained further that "[e]mployment, licensing, custody or other legal rights under California law are not refused merely because of the deleterious effect of a bad reputation." *Id.* In the present case, the Court concludes that the Plaintiff has not presented any

---

[8]The "stigma-plus test" as articulated by the Supreme Court in *Paul v. Davis* provides that "procedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of "a right or status previously recognized by state law."" *Humphries*, 554 F.3d at 1185 (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)); *see also Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (reaffirming that an injury to reputation alone is not a protected liberty interest under the Fourteenth Amendment).

1   evidence that could satisfy the "stigma-plus test" as set forth in *Humphries*. Plaintiff argues vaguely

2   that the referral of him for inclusion in the CACI violated his constitutional rights. He argues that

3   CPS was required to report him for inclusion in the CACI because it determined that the matter

4   involving CV-2 was "inconclusive" rather than "unfounded." Plaintiff cites no evidence that his

5   name was ever included in the CACI. The undisputed evidence in this case demonstrates that he

6   was never included in the CACI. Thus, this case does not approach the facts of *Humphries* at all.

7       Plaintiff's argument fails for an additional reason. The Plaintiff's argument that he was "in

8   jeopardy" of being placed on the CACI is conjectural. There is no evidence that he was in fact

9   placed on the CACI. Thus, it is doubtful that the Plaintiff has standing to pursue this claim. *See*

10  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (in order to establish standing, plaintiff

11  must have suffered an injury in fact - an invasion of a legally protected interest that is concrete and

12  particularized and not conjectural or hypothetical). Similarly, Plaintiff's claim that he was referred

13  for criminal prosecution in violation of the Constitution, fails for this reason. Just as Plaintiff was

14  never actually placed on the CACI, Plaintiff was never prosecuted for a crime. Thus, he can

15  demonstrate no concrete interest that was harmed as a result of the *referral* for a prosecution that

16  never in fact occurred or the *possibility* that he might have been placed on the CACI.

17      The Court GRANTS the Officer and Town and Defendants' Motions for Summary Judgment

18  based upon the Child Protective Services report. The Claim fails as a "stand alone" due process

19  violation under the Ninth Circuit's decision in *Humphries, supra*.[9] For the same reasons, Plaintiff's

20  Motion for Summary Judgment on Claim 7 is DENIED.

21      **E.      First Amendment Retaliation Claim**

22          **1.      First Amendment Retaliation Claim – Legal Standard**

23      Plaintiff's third claim in this case against all Defendants under 42 U.S.C. § 1983 is for

24  violating his First Amendment rights of freedom of expression. The First Amendment states:

25  "Congress shall make no law respecting ... the right of the people ... to petition the Government for a

26  redress of grievances." The right to petition extends to all departments of the government. "The

27  right of access to the courts is indeed but one aspect of the right of petition." *California Motor*

28  *Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citations omitted).

---

[9]The First Amendment claim is addressed below.

25

In order to state a First Amendment retaliation claim, a plaintiff must show: "(1) that the plaintiff 'was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity'; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'" *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *see also Mendocino Environment Center v. Mendocino County*, 192 F.3d 1283, 1300-1301 (9th Cir. 1999). A plaintiff "may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives." *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994) (citations omitted). However, a plaintiff may state First Amendment Claim where the plaintiff "allege[s] discrete acts of police surveillance and intimidation directed solely at silencing" her or him. *Id.* The defendant's intent is an element of the claim. *Id.* (citing *Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir.1989) (to avoid dismissal of claim for retaliatory firing, plaintiff need only allege that defendant's conduct "was motivated by an intent to retaliate for [the plaintiff's] exercise of constitutionally protected rights"). At the summary judgment stage, a plaintiff must have evidence from which a reasonable inference may be drawn that the defendant intended to retaliate.

### 2. First Amendment Retaliation Claim Against the Town and County

Plaintiff alleges that the Town and County's withholding of the police report in this case for a period of six months constitutes a First Amendment violation because such actions chilled or silenced Plaintiff in the exercise of his First Amendment right to petition the government for redress of his grievances. Plaintiff also argues that he suffered harm in the form of $100,000 in needless attorneys' fees and costs due to the fact that the Defendants' delay in providing him with the police report meant that he missed the deadline to seek *factual* innocence through an administrative petition. Due to the Defendants' delay in providing the report, Plaintiff claims that he was forced to litigate the factual innocence in superior court, which was more costly, and resulted in emotional harm for the additional five months that he was required to wait for the factual innocence determination.

As Plaintiff explains in his Opposition to the Town's Motion, a finding or determination of factual innocence is a two-tier process. *See* Pl.'s Opp. to Town's Motion at 10 (citing California

United States District Court

For the Northern District of California

Penal Code §851.8).  First, a person seeking a declaration of factual innocence (and the resulting benefit of having his/her arrest record destroyed) must first make an application to the relevant local law enforcement agency to request an administrative determination or declaration of factual innocence. §851.8 (a).  The local law enforcement agency must make the determination of whether or not to grant the application, in consultation and with the concurrence of the district attorney's office.  Then, if the law enforcement agency and/or district attorney's office do not act on the application or deny the application within 60 days of the making of the application, the applicant may file a petition with the relevant superior court, for a judicial finding of factual innocence. § 851.8 (b).  It is undisputed that the Plaintiff submitted his application for an administrative determination of factual innocence with the Atherton Police Department and the San Mateo County District Attorney's Office.  Plaintiff argues that he was compromised in his ability to pursue this petition because "during the entire process of the application for an administrative determination of factual innocence, Atherton refused to provide him with a copy of the police report.  Therefore, he had to make his administrative application without the benefit of knowing what evidence or information is contained in the police report."  Pl.'s Opp. to Town's Motion at 11.

Plaintiff points out that the Town of Atherton then denied Mr. Buckheit's administrative application, without providing him with a copy of the police report.  Plaintiff argues that he then "had to sue subsequently, to finally obtain a copy of the police report."  *Id.*  However, by the time that Plaintiff finally obtained a copy of the police report, the time for the administrative determination of factual innocence had already passed.  *Id.*  When he received the report, Plaintiff argues that he "was left with only the remedy of filing of filing the petition in superior court for a judicial determination of factual innocence.  As a direct result of his being forced to file and litigate his petition at the superior court level, Mr. Buckheit incurred legal expenses and costs in excess of $100,000, as well as an additional delay of about 5 months before he obtained the superior court's judicial finding of factual innocence."  *Id.*

The Court agrees with the Defendant Town and County that the act of temporarily withholding the police report from Plaintiff in this case fails to establish a retaliation claim under the First Amendment as a matter of law.

United States District Court

For the Northern District of California

1      As a threshold matter, the Court agrees with the Plaintiff that the filing of a petition for

2   factual innocence constitutes constitutionally protected speech.  The Court is not persuaded,

3   however, that the delay in providing Plaintiff with a copy of the police report had any chilling effect.

4   As stated previously, in order to prevail on a First Amendment retaliation claim under § 1983 , in

5   addition to establishing that his speech or act was constitutionally protected, a plaintiff must

6   demonstrate that the defendant's retaliatory conduct adversely affected the protected speech; and

7   that the protected activity was a "substantial" or "motivating factor" for defendant's conduct.  *See*

8   *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

9      Here, there is no evidence to support a finding of any adverse or chilling effect on the

10  Plaintiff's speech, nor is there evidence of an intent to retaliate.  As the Town correctly points out,

11  the proper inquiry in a First Amendment retaliation case, is whether the defendant's action would

12  chill or silence a person of ordinary firmness from future First Amendment activities.  *See* Town's

13  Reply at 12 (citing *Jane Doe v. County of San Mateo* 2009 WL 735149 *5 (N. D. Cal., March 19,

14  2009) (citation omitted).  There is no evidence that the actions of which Plaintiff complains would

15  have (or did have in this case) a chilling effect.  Indeed, the evidence in this case is to the contrary.

16  Without the police report, Plaintiff accomplished a significant amount in his petitions against the

17  government to redress his grievances.  He filed (and won) a finding of factual innocence in Superior

18  Court and he litigated the present federal lawsuit.  Even assuming the truth of Plaintiff's assertion

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

1  that he was wrongfully denied the police report (a contention the Court finds doubtful[10]), there is

2  simply no evidence of any adverse impact on his access to the courts.

3      Plaintiffs makes much of the fact that he was forced to proceed with his administrative

4  petition for factual innocence without the aid of the police report.  His argument assumes that the

5  petition would have been granted in the first instance without his having to file in Superior Court if

6  he had possessed a copy of the report earlier, and further, the argument assumes that Plaintiff has a

7  right to a particular result in response to a petition for redress of grievances.  There is no evidence to

8  support the speculation that he would have prevailed in his administrative petition had the police

9  report been available.  The First Amendment right to petition the government for redress of

10  grievances does not grant a corresponding right to an particular action in response to a grievance.

11  *Jane Doe*, *supra*, 2009 WL 735149 * 6 (citing *Flick*, 932 at F.2d . at 729).

12      Finally, there is no evidence to support a finding that the Plaintiff's constitutionally-protected

13  conduct – the filing of the factual innocence petition - was a "substantial" or "motivating factor"

14  behind the Town's delay in providing the report.  The evidence in this case is that the Town

15  withheld the police report based upon Government Code § 6250 *et. seq*. because the Plaintiff was

16  listed a the suspect in the case.  Other than the Plaintiff's own speculation, there is no evidence that

17  his petition for factual innocence was the "substantial" or "motivating factor" behind the Town's

18  delay in providing Plaintiff with a copy of the police report.

---

20

21      [10]Plaintiff argues that the Defendants wrongfully withheld the police report from him in response
   to his California Public Records Act request because California Government Code section 6254(f)

22  provides that information contained in a police report must be disclosed to any person suffering bodily
   injury as a result of the incident.  Because there is no dispute that Plaintiff suffered injuries – on his face,

23  and hands from being bitten by CV-1 – Plaintiff argues that "there is no dispute" that the Town of
   Atherton wrongfully withheld the police report from him.  The Court is not persuaded by this argument.

24  First, the law is clear that police reports are not subject to disclosure, but that there is an exception for
   any *victims* of a crime, not the *suspects* named in a police report. There is no dispute that Plaintiff was

25  the named suspect in this case.  Section 6254 provides that "any investigatory or security files" compiled
   by any state or local agency for law enforcement purposes are not required to be disclosed, "except that

26  state and local law enforcement agencies shall disclose the names and addresses of persons involved in,
   or witnesses other than confidential informants" to an incident, as well as "statements of the parties

27  involved in the incident, the statements of all witnesses, other than confidential informants." Cal. Gov't.
   Code § 6254(f). These records are to be disclosed "to the victims of an incident, or an authorized

28  representative thereof," unless disclosure would "endanger the safety of a witness" or "endanger the
   successful completion of the investigation." *Id.* Nowhere in this section is there support for Plaintiff's
   argument that a suspect is entitled to a copy of the police report.  Plaintiff was, ultimately, provided a
   copy with it, albeit months after he wanted it.  None of these actions rise to the level of a constitutional
   violation, and Plaintiff has cited no authority in support of his position.

With respect to the County, the Plaintiff similarly offers no evidence that the Plaintiff's constitutionally-protected conduct was a "substantial" or "motivating factor" behind the County's decision not to provide Plaintiff with a copy of the police report.  The evidence submitted by the County (evidence not disputed by Plaintiff), indicates that the County did not possess the police report at the time of Plaintiff's request to the County.  *See* County's Opp. to Plaintiff's Motion for Summary Judgment at 13 (citing Declaration of Stephen Wagstaffe, ¶¶ 6-10, Docket No. 187-2) ("as is customary, the District Attorney's Office did not retain any copies of the police report because the Office had declined to prosecute Mr. Buckheit); *see also* Declaration of Plaintiff Jonathan Buckheit, Docket No. 191, ¶ 6 ("I went to the San Mateo County District Attorney's Office during the week of November 17, 2008 to request a copy of the [police] report.  I was told by their receptionist that they no longer had it, and I needed to obtain it from the Atherton police department.").  The undisputed evidence also demonstrates that the District Attorney sought to assist Plaintiff in obtaining a copy of the police report from the Town of Atherton by asking Police Chief Nielsen .  *Id.* (Citing Declaration of Brian J. Wong, Exh. B, Wagstaffe Depo. 22:3-25:10, Docket No. 187-3).  Thus, there is no evidence of an intent to retaliate.

Plaintiff offers no evidence to dispute the evidence proffered by the County.  At the summary judgment stage, the Plaintiff needs evidence, not merely allegations, in order to withstand the Defendant's motion.  The First Amendment Claims against the Town and County based on the withholding of the police report must be dismissed.[11]

### 2. First Amendment Claim Against the Individual Officers

With respect to the individual officers, Plaintiff clarifies in his Opposition to the Officer Defendants' Motion that the Defendants' actions against Plaintiff "arose from their intent to retaliate against Mr. Buckheit for daring to complain about his mistreatment by the Defendants and Mr. Buckheit's apprent intention to petition to the proper authorities to seek redress for his complaints of mistreatment by the Defendants, so as to 'chill' Mr. Buckheit's exercise of his right to do so."  Pl.'s Opp. to Officer Defendants' Motion at 22.  Plaintiff asserts the following acts of retaliation by Defendants in violation of the First Amendment: 1) writing/approving a police report in which CV-2

[11]In addition, as discussed below, there is no viable retaliation claim against the Officer Defendants.  Accordingly, the Town and County cannot be held liable under the First Amendment for the Officers' actions.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   was labeled as a victim of 273.5 committed by Plaintiff; 2) writing/approving a police report in

2   which Plaintiff was recommended for criminal prosecution for 273.5 as to the minor, CV-2; 3)

3   writing/approving a police report in which Plaintiff was coded as committing a physical strong-arm

4   attack against the minor; and 4) referring Plaintiff (along with the police report that indicated that a

5   minor was a victim of physical child abuse) to CPS.  Plaintiff argues that a genuine issue of material

6   fact exists in this case as to these acts of retaliation because it is undisputed that all of these events

7   occurred *after* Plaintiff complained about the arresting officers' treatment of him.  Specifically, the

8   edits changing CV-2 from a witness to a victim and the associated means of attack and the referral to

9   CPS all occurred after Plaintiff told the officers on the night of October 19, 2008 that he would be

10  complaining about them.  Plaintiff argues that "[t]his timeline alone, with all inferences taken in Mr.

11  Buckheit's favor, as they must be, would lead to a reasonable inference of a cause-effect

12  relationship."  Pl.'s Opp. to Officer Def. Motion at 23.

13      Defendants argue that there is no evidence to support Plaintiff's claim of retaliation against

14  the Officers.  First, the Officers argue that none of the acts complained of here was known to the

15  Plaintiff until April 22, 2009 (over six months post-arrest) when he saw a copy of the police report

16  for the first time.  *See* Buckheit Decl., ¶13 (stating that he ". . .finally learn[ed] from the police

17  report . . . in April of 2009, that [he] had been accused of child abuse and referred to the child abuse

18  index. . . and "learned from the police report that the arresting officers had recommended that [he]

19  be prosecuted for violating California Penal Code § 273.5(a) as against both CV-1 and CV-2 (the

20  minor son of CV-1).").  Thus, the alleged retaliatory acts of putting false information in the police

21  report would not deter a person of ordinary firmness from future First Amendment activities in this

22  case because the Plaintiff was not even aware of them.  Nor did such information have an actual

23  chilling effect or deter the Plaintiff from pursuing his case, given that he was unaware of it.  Officer

24  Defs.' Reply at 9.  Second, the Officers argue that the harm alleged in this case was minimal at best

25  and that the "adverse action" element of a First Amendment retaliation claim requires more than

26  minimal harm.  *Id.* (citing *Broadheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009).

27      The Court finds that the undisputed facts in this case fail to establish a First Amendment

28  violation against the individual Officer Defendants as a matter of law.  As stated above, to prevail on

    a § 1983 claim for retaliation in violation of the First Amendment, "a plaintiff must establish first,

1    that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct

2    adversely affected the protected speech; and third, that there is a causal connection between the

3    retaliatory actions and the adverse effect on speech." *Jane Doe v. County of San Mateo*, 2009 WL

4    735149 *5 (N. D. Cal., March 19, 2009) (citations and internal quotations omitted).

5            It is undisputed that Plaintiff complained to the Officers after his arrest and that he

6    subsequently began factual innocence proceedings.  Further it is undisputed that Plaintiff's conduct

7    in petitioning the court for factual innocence constitutes "petitioning the government for redress of

8    grievances."  It is also undisputed that the police report in this case contained errors, namely, the

9    inclusion of CV-2 as a "victim," the erroneous inclusion of a code that indicated that Plaintiff had

10   committed a "physical/strong arm" attack against CV-2, and the mistaken referral for prosecution

11   relating to CV-2.

12           Plaintiff, however, suffered no cognizable "adverse" effect from these acts.  Indeed, he has

13   presented no evidence that any of the retaliatory acts had any adverse effect on him or would have

14   had a chilling effect on his speech.  He was not prosecuted.  CPS declined to intercede.  Moreover,

15   the act of including erroneous information in a police report cannot by itself constitute retaliation as

16   a matter of law because the First Amendment right to petition the government for redress of

17   grievances does not grant citizens the right to any particular outcome or action in response to that

18   grievance.  *See Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991).  As the district court explained in

19   *Doe v. County of San Mateo, supra*, "plaintiff cannot demonstrate that the officers' failure to

20   investigate and falsification of their reports constitutes an adverse action because she has no right to

21   an investigation or to accurate police reports."  *Doe, supra* at *6.

22           Accordingly, Plaintiff fails to meet the requirement that retaliatory conduct had any adverse

23   effect on his speech.

24   **F.     Plaintiff's *Monell* Claim Against the Town of Atherton Claim 2, 42 U.S.C. §
             1983, Gender Discrimination & Claim 6, 42 U.S.C. § 1983, Retaliation; Claim 8,
25           42 U.S.C. § 1985, Conspiracy to Violate Civil Rights**

26           Defendants argue that Plaintiff's § 1983 claims fail as a matter of law because the Town of

27   Atherton cannot be vicariously liable for the allegedly unconstitutional actions of its Officers in this

28   case.  The Court agrees.

32

United States District Court

For the Northern District of California

1    A municipality can be found liable under 42 U.S.C. §1983 only where the municipality itself

2 causes the constitutional violation at issue; *respondeat superior* or vicarious liability will not attach

3 under section 1983.  *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 694-95 (1978).

4 Plaintiff must allege that: (1) Mr. Buckheit was deprived of his constitutional rights by Town

5 employees acting under color of State law; (2) the Town had customs or policies which amount to

6 "'deliberate indifference' to his constitutional rights;" and that (3) these policies were the "'moving

7 force behind the constitutional violation[s].'"  *Oviatt v. Pearce*, 954 F.2d 1470, 1474, 1477 (9th

8 Cir.1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989)).  Further, acquiescence in

9 a practice or custom is a cognizable claim under *Monell.  Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.

10 701, 737 (1989).

11    A municipality's failure to train or supervise its employees properly can create section 1983

12 liability where such a failure is "conscious" or "amounts to deliberate indifference to the rights of

13 persons" with whom its employees are likely to come into contact.  *City of Canton*, 489 U.S. at

14 388-89.  The inadequate training must have actually caused the constitutional injury.  *Id.*  "That

15 happens when the municipality makes a deliberate, conscious choice, and the resulting deficient

16 training has a direct, causal link to the deprivation of federal rights."  *Gomez v. City of Fremont*, 730

17 F.Supp.2d 1056, 1069 (N.D. Cal. 2010) (citing *City of Canton*, 489 U.S. at 388).

18    First, the Town and County cannot be held liable under *Monell* because there were no

19 underlying violations: the Officers did not arrest without probable cause, did not discriminate on the

20 basis of gender, and did not retaliate in violation of the First Amendment.

21    In addition, the Town argues that it cannot be held vicariously liable for the actions of its

22 officers Dennis, DeVlugt and Kockler and that no evidence exists to support the Plaintiff's argument

23 that the Town of Atherton had a policy, custom or longstanding practice to discriminate against men

24 in domestic violence mutual combat situations, to arrest suspects without probable cause or to

25 deliberately retaliate against those suspects who complain of police misconduct who have sued the

26 Town.  The Court agrees.

27    There is no evidence before the Court that the Town of Atherton has any policy, practice or

28 custom of retaliating against individuals on the basis of their exercising their First Amendment right

to petition the government of redress of grievances.  Nor is there any evidence of a policy, practice

United States District Court

For the Northern District of California

1   or custom of discriminating against men in mutual combatant domestic violence situations.  Finally,

2   there is no evidence that the Town of Atherton's omissions led to the alleged acts of retaliation

3   against Plaintiff.  These claims fail as a matter of law.

4        Further, there is no evidence to support the Plaintiff's alternative theory – that Defendant

5   Kockler had final decision-making or policy making authority for the Town and thus personally

6   violated Plaintiff's civil rights, thereby creating direct municipal liability.

7        Without citation to any authority, Plaintiff argues that Defendant Kockler, by virtue of his

8   supervision of Defendants Dennis and DeVlugt on the night of the arrest, and the fact that he gave

9   final approval to the police report at issue, creates a genuine issue of material fact as to whether he

10   was acting as "a final policy maker for the Atherton police department."  Pl.'s Opp. to Town's Mtn.

11   at 4; Pl.'s Opp. to Officers' Motion at 25.  Plaintiff argues that "[s]he question of whether or not a

12   defendant was the final policy maker is an issue for the jury to resolve at trial."  Pl.'s Opp. to

13   Town's Motion at 4.  Further, Plaintiff argues that Defendant Kockler is liable under § 1983 if his

14   acts or omissions proximately caused Defendants Dennis and DeVlugt to commit the constitutional

15   violations against Plaintiff.  Pl.'s Opp. to Officers' Motion at 25.  He argues that it was entirely

16   foreseeable that Kockler's approval over the telephone of the Officers' decision to arrest Plaintiff

17   would lead to the wrongful arrest of Plaintiff.  *Id.*  Plaintiff urges the Court to reject the Defendants'

18   arguments that Kockler was off-duty on the night in question due to the fact that Kockler was called

19   by the Defendants in his capacity as a supervisor.  *Id.*

20        The Court finds that the Town cannot be liable under the facts of this case.  "A municipality

21   ... can be liable for an isolated constitutional violation if the final policymaker 'ratified' a

22   subordinate's actions."  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).  "A plaintiff may

23   show that an official policymaker either delegated policymaking authority to a subordinate or

24   ratified a subordinate's decision, approving the decision and the basis for it."  *Hyland v. Wonder*,

25   117 F.3d 405, 414 (9th Cir. 1997).  "The identification of policymaking officials is a question of

26   state law."  *St. Louis v. Paprotnik*, 485 U.S. 112, 124 (1988).  "[U]nder California law, a city's

27   Charter determines municipal affairs ...."  *Hyland*, 117 F.3d at 414.  There is no evidence that

28   Defendant Kockler was a "final policy maker" for the Town; Plaintiff is incorrect in the assertion

   that such a determination is always a question for the jury.  There must be evidence, from which a

United States District Court
For the Northern District of California

1   reasonable jury could reach such a conclusion.  Plaintiff has proffered no evidence from which any

2   inference could be draw that Defendant Kockler was an official policymaker or that he was

3   delegated any such authority.  This claim fails as a matter of law.

4       **G.     Conspiracy Claim Under 42 U.S.C. § 1985 (Claim 8 Against County of San
              Mateo and Town of Atherton)**

5

6       In Plaintiff's eighth claim for relief, he alleges that Defendants County and Town entered

7   into a conspiracy in which they agreed to deny Plaintiff's factual innocence petition, and retaliated

8   against Plaintiff for petitioning the government to redress his grievances.  SAC ¶ 71-73.  Plaintiff

9   further alleges that the County and Town agreed to "stonewall" the Plaintiff's efforts to seek redress

10  for his grievances by refusing to provide him with a copy of the police report of the October 19,

11  2008 arrest, despite Plaintiff's repeated requests for a copy of the report.  SAC ¶ 73.  In both the

12  County and Town's Motions for Summary Judgment, the Defendants argue that Plaintiff's

13  conspiracy claim is not supported by any evidence and must be dismissed.  The Court agrees.

14      In order to prevail on a claim under 42 U.S.C. § 1985, a plaintiff must establish, *inter alia*,

15  that the defendants harbored a class-based or invidiously-discriminatory animus.  *Canlis v. San*

16  *Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 719 (9th Cir. 1981).

17      In the present case, as described in greater detail above with respect to the Equal Protection

18  Claim, there is no evidence of discriminatory intent or purpose.  Further, as explained in greater

19  detail above, there is no evidence in this case of retaliation on account of the Plaintiff's decision to

20  petition the government for redress of his grievances against the Town of Atherton and its Officers.

21  Finally, there is no evidence whatsoever of any "agreement" between the Town and County.  Nor is

22  there evidence in support of the acts alleged in furtherance of the alleged conspiracy.

23      This claim fails as a matter of law.  The Defendant County and Town's Motions for

24  Summary Judgment on the eighth claim for conspiracy are GRANTED.

25      **H.     The County's Motion for Summary Judgment**

26      The Defendant County of San Mateo moves for summary judgment as to all claims in the

27  Second Amended Complaint against it (the third, fourth, seventh and eighth claims).

28      Specifically, the County argues that the third and fourth claims against it under 42 U.S.C. §

    1983 fail as a matter of law because there is no evidence that the County had any control over the

1   Town of Atherton. The Court finds that these claims fail for the reasons stated previously, *i.e.*, the

2   Court has found that there was no unconstitutional policy carried out by the Town. The County

3   therefore cannot be liable for the policies of the Town, which the Court has found to be gender

4   neutral.

5        There can be no *Monell* liability against the County for the employees of the Town of

6   Atherton. This claim barely survived the County's Motion to dismiss because of allegations that the

7   County agreed to a discriminatory policy carried out by the Town and based upon the allegation that

8   the County agreed to train officers from the Town of Atherton. *See* Dkt. 74, "Order Granting in Part

9   and Denying in Part Defendant San Mateo County's Motion to Dismiss Second Amended

10  Complaint" at 8-10.

11       Here, the Plaintiff has failed to establish the presence of any agreement between the County

12  and the Town such that the Town would carry out the discriminatory training policies of the County.

13  There is no evidence that the County had anything to do with the Plaintiff's arrest, nor is there

14  evidence that the arresting Officers were employed by the County. Moreover, as stated above, there

15  is no evidence of a discriminatory policy.

16       The County also moves for summary judgment as to the seventh and eighth claims for relief

17  for retaliation and conspiracy. For the reasons stated previously, these claims fail as a matter of law.

18  Plaintiff has no admissible evidence of discriminatory intent nor is there evidence of retaliation.

19  Finally, there is no evidence whatsoever of any conspiracy between the Town of Atherton and the

20  County of San Mateo to violate Plaintiff's constitutional rights.

21      **I.**    **Defendant Town's Motion for Summary Judgment of the State Law Claims**

22       The individual Officer Defendants move for summary judgment of the state law claims on

23  the grounds that they are barred by state privileges and immunities. Officer Defs.' Motion at 16.

24  Plaintiff does not oppose this portion of the Defendants' Motion. There are no state law claims in

25  the Second Amended Complaint.

26      **J.**    **The Plaintiff's Motion for Summary Judgment**

27       Plaintiff moves for summary judgment against all Defendants that certain issues were

28  decided as a result of the two-day evidentiary hearing held on December 12, 2009 and January 12,

    2010 in San Mateo County Superior Court, the Honorable Mark R. Forcum presiding. Judge

1   Forcum filed an order in March of 2010, in which he found that Plaintiff was "factually

2   innocent"and  that there was no reasonable cause to believe that Plaintiff had committed the offense

3   for which he was arrested.  Plaintiff's Motion at 6.

4        In the present Motion, Plaintiff argues that the Superior Court's finding of factual innocence

5   should apply as collateral estoppel to preclude Defendants from re-litigating the issue of whether the

6   police officers had probable cause to arrest Plaintiff on October 19, 2008.  The Plaintiff is incorrect.

7        **1.       Plaintiff's Motion Regarding Collateral Esoppel of the Factual Innocence
            Findings**

9            **a.       The Factual Innocence Determination is Inadmissible**

10       As a preliminary matter, California Penal Code § 851.8(i) states:  "Any finding that an

11   arrestee is factually innocent pursuant to subdivision (a), (b), (c), (d) or (e) shall not be admissible as

12   evidence in any action."  Cal. Penal Code § 851.8(i).  Despite the applicability of § 851.8(i), Plaintiff

13   maintains that "certain findings" short of the "ultimate finding" of his factual innocence are

14   nevertheless admissible.

15       For example, the finding by Judge Forcum that there was no evidence that Mr. Buckheit had
         acted with willful intent against CV-1 is a finding that was a necessary step in the process of
16       the court's ultimate finding of factual innocence but it is not the same as the ultimate finding
         of factual innocence. . . Therefore, the finding of lack of willful intent is not made
17       inadmissible under § 851.8(i).

18   Plaintiff's Reply Brief to Defendants Dennis, DeVlugt & Kockler's Opposition to Plaintiff's Motion

19   for Summary Judgement re Certain Issues of Fact Based on Collateral Estoppel (hereinafter

20   "Plaintiff's Reply Br.") at 2.  Plaintiff argues that "by its explicit language, § 851.8(i) makes

21   inadmissible only the ultimate finding of factual innocence."  *Id.*

22       Plaintiff's argument is without merit.  By its explicit language, § 851.8(i) excludes from

23   evidence "[a]ny finding" that the arrestee is factually innocent.  Cal. Penal Code § 851.8(i).  Despite

24   Plaintiff's citations to various California cases, Plaintiff provides no support for the argument that

25   only the "ultimate finding" is inadmissible.  Although Plaintiff argues that judicial findings made

26   pursuant to § 851.8(b) are admissible, § 851.8(i) expressly includes subdivision (b) within its scope.

27   *See* Cal. Penal Code § 851.8(i) ("Any finding . . . pursuant to subdivision (a), (b), (c), (d) or (e) shall

28   not be admissible as evidence in any action.").

**United States District Court**
For the Northern District of California

Plaintiff argues that Judge Forcum's order "specifically provides that the contents of the sealed transcript may be used." Plaintiff's Reply Br. at 3. Plaintiff quotes Judge Forcum's statement that "*records sealed pursuant to this order* may be opened an used in connection with any civil litigation . . ." *Id.* (emphasis added). The purpose of § 851.8 is to seal and destroy the criminal records of arrestees who are subsequently deemed innocent. *See* Cal. Penal Code § 851.8. When an arrestee initiates civil litigation, subdivision (k) of § 851.8 delays destruction of the sealed records, and, "upon a showing of good cause," allows the arrestee to admit the sealed records as evidence in subsequent actions. *See* Cal. Penal Code § 851.8(k). Subdivision (k) applies to the records for which the § 851.8 proceeding is intended to protect, such as the police report written the day of the arrest. Contrary to Plaintiff's contention, subdivision (k) does not apply to the transcript of a § 851.8 hearing.

The Ninth Circuit's decision in *Humphries, supra*, 554 F.3d 1170, confirms this point. In *Humphries*, the plaintiffs argued that § 851.8(i) was qualified by § 851.8(k) such that upon a "showing of good cause," the findings of their factual innocence was admissible in a § 1983 action. *Humphries,* 554 F.3d at 1181, fn.6. The Ninth Circuit rejected the plaintiffs' argument, stating that §851.8(k) "does not allow a 'finding of factual innocence' to be submitted into evidence, but rather the underlying 'sealed records.'" *Id.* The Court concludes that the finding of factual innocence in the present case, including all of the underlying factual determinations by Judge Forcum, must be excluded under § 851.8(i).

          **b.    Section 851.8(i) Prevents This Court from Applying Collateral Estoppel**

Plaintiff next argues that even if the finding of factual innocence is inadmissible, the Court is not precluded from applying collateral estoppel here. *See* Plaintiff's Reply Brief to Officers at 1 ("§ 851.8(i)(1) simply sets forth a rule of evidence for the California courts to follow" which is "not relevant to the determination of whether or not collateral estoppel applies . . . ."). In support of his argument, Plaintiff cites *Tennison v. California Victim Compensation and Gov't Claim Bd.*, 152 Cal. App. 4th 1164 (2007). The Court is not persuaded by Plaintiff's contention that *Tennison* is "binding legal authority . . . that § 851.8(i) is a rule of evidence which is not relevant to the determination of whether the doctrine of collateral estoppel applies." Plaintiff's Reply  at 3.

1    The plaintiff in *Tennison* argued that § 851.8(i) only applied to regular court "actions," not

2 "special proceedings" before the California Victim Compensation and Government Claims Board.

3 *Tennison*, 152 Cal. Appl. 4th at 1173, fn. 6; *see also* Cal. Penal Code § 851.8(i) ("Any finding that

4 an arrestee is factually innocent . . . shall not be admissible as evidence in *any action*.") (emphasis

5 added).  In *Tennison*, the California Court of Appeal declined to decide whether § 851.8(i) *applies to*

6 *administrative proceedings* the same way as it does in civil actions.  *Tennison*, 152 Cal. Appl. 4th at

7 1173, fn.6 ("We prefer to resolve the issue of preclusion under traditional principles of collateral

8 estoppel, and, consequently, need not decide today whether section 851.8, subdivision (i)'s

9 limitation on admissibility applies to proceedings under section 4900.").  Two years after *Tennison*,

10 the California State Legislature amended § 851.8(i), adding subdivision (2), which explicitly makes

11 admissible findings of factual innocence in proceedings before the California Victim Compensation

12 and Government Claims Board.  *See* Cal. Penal Code § 851.8(i)(2).  Therefore, the evidentiary issue

13 in *Tennison* has been resolved –  findings of factual innocence are admissible in proceedings before

14 the California Victim Compensation and Government Claims Board.  *Id*.  If the proceeding is not

15 before the California Victim Compensation and Government Claims Board, the rule remains the

16 same – findings of factual innocence are inadmissible.  *See* Cal. Penal Code § 851.8(i)(1).

17    Because the finding of factual innocence is inadmissible pursuant to § 851.8(i)(1), the

18 finding of factual innocence cannot be the basis for applying collateral estoppel.  "A trial court can

19 only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of*

20 *Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

21    Even if the Court were to find the Superior Court's factual innocence determination

22 admissible here, the Court nevertheless concludes that Plaintiff cannot satisfy the requirements for

23 collateral estoppel.  "Collateral estoppel precludes relitigation of issues argued and decided in prior

24 proceedings."  *Lucido v. Superior Court of Mendocino Cnty*., 51 Cal. 3d 335, 341 (1990).  State

25 court judgments may preclude the relitigation of an identical issue that arises in a subsequent federal

26 civil rights action.  *Allen v. McCurry,* 449 U.S. 90, 103-04 (1980); *Hawkins v. Risley,* 984 F.2d 321,

27 323 (9th Cir. 1993).  "Federal courts should apply the state's collateral estoppel law in determining

28 whether a § 1983 claim is precluded by a prior state judicial proceeding."  *Presley v. Morrison,* 950

F.Supp. 1298, 1305 (E.D. Pa. 1996); *see Allen,* 449 U.S. at 96.  In California, collateral estoppel

1   entails five threshold requirements.  *Lucido*, 51 Cal. 3d at 341.  "First, the issue sought to be

2   precluded from relitigation must be identical to that decided in a former proceeding.  Second, this

3   issue must have been actually litigated in the former proceeding.  Third, it must have been

4   necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be

5   final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or

6   in privity with, the party to the former proceeding."  *Id.*

7          Even assuming all five threshold requirements are met, courts applying California's law on

8   collateral estoppel look to "the public policies underlying the doctrine before concluding that

9   collateral estoppel should be applied in a particular setting."  *Id.* at 342-43.  Such policies include

10  the "preservation of the integrity of the judicial system, promotion of judicial economy, and

11  protection of litigants from harassment by vexatious litigation. . . ."  *Id.* at 343.  These considerations

12  "strongly influence whether its application in a particular circumstance would be fair to the parties

13  and constitutes sound judicial policy."  *Id.*  Lastly, the offensive use of collateral estoppel is more

14  closely scrutinized than the defensive use of collateral estoppel.  *Tennison*, 152 Cal. App. 4th at

15  1174.

16          In the present case, the issues are not identical and the application of collateral estoppel

17  would be contrary to public policy.  Because Plaintiff fails to satisfy the requirement of identity of

18  issues, the Court need not address whether the parties are the same or in privity.

19          With respect to the identity of issues, Plaintiff argues that the issues in the factual innocence

20  determination and this current action are identical because they both entail a determination of

21  whether the officers had probable cause to arrest.  Plaintiff's Motion at 8.  Defendants respond by

22  pointing to the distinction between "factual innocence" and "probable cause."  Defendants argue that

23  in a factual innocence hearing, the petitioner may introduce all material, relevant and reliable

24  evidence, but in considering probable cause, courts do not consider facts learned after the arrest.  *See*

25  *People v. Adair*, 29 Cal. 4th 895, 905 (2003) (noting facts subsequently disclosed may establish a

26  defendant's factual innocence, even when there was sufficient probable cause to arrest).

27          The Court agrees.  Factual innocence and probable cause are two distinct issues.  Factual

28  innocence is a determination that "no reasonable cause exists to believe that the arrestee committed

    the offense for which the arrest was made."  Cal. Penal Code § 851.8(b).  On the other hand,

United States District Court

For the Northern District of California

1    "[p]robable cause exists where the 'facts and circumstances within [an officer's] knowledge and of

2    which [he] had reasonably trustworthy information [are] sufficient in themselves warrant a man of

3    reasonable caution in the belief that' an offense has been or is being committed." *Safford Unified*

4    *Sch. Dist. # 1 v. Redding,* – U.S. – , 129 S.Ct. 2633, 2639 (2009) (quoting *Brinegar v. United States,*

5    338 U.S. 160, 175-76 (1949)).  A finding of factual innocence and a finding of probable cause can

6    co-exist.  An officer may have probable cause to arrest, but later discover facts which would lead to

7    a determination of factual innocence.  Therefore, collateral estoppel does not bar Defendants from

8    litigating the issue of probable cause in this federal lawsuit.  Because the Court concludes that the

9    issues are not identical, the Court need not address whether the parties are identical or are in privity.

10          Accordingly, Plaintiff's Motion for Summary Judgment on his First and Second Causes of

11   Action is DENIED.

12   **IV.      CONCLUSION**

13          For the foregoing reasons, the Defendants' Motions for summary judgment are GRANTED;

14   Plaintiff's Motion is DENIED.  Claim 11 of the Second Amended Complaint for "Declaratory

15   Relief" is also DISMISSED.

16

17   The Clerk shall close the file.

18          IT IS SO ORDERED.

19   Dated: April 6, 2012

20                                                    _____
                                                     JOSEPH C. SPERO
21                                                   United States Magistrate Judge

22

23

24

25

26

27

28